IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Deborah D. Smith,                  ) | Civil Action No. 6:15-1489-TLW-KFM |
|            Plaintiff,    ) | |
|                   ) | **REPORT OF MAGISTRATE JUDGE** |
|      vs.                  ) | |
|                   ) | |
| Carolyn W. Colvin, Acting   ) | |
| Commissioner of Social Security,   ) | |
|                   ) | |
|            Defendant.   ) | |
| _____ ) | |

         This case is before the court for a report and recommendation pursuant to Local Civil Rule 73.02(B)(2)(a) (D.S.C.), concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).

         The plaintiff brought this action pursuant to Section 205(g) of the Social Security Act, as amended (42 U.S.C. 405(g)) to obtain judicial review of a final decision of the Commissioner of Social Security denying her claim for disability insurance benefits under Title II of the Social Security Act.

## ADMINISTRATIVE PROCEEDINGS

         The plaintiff filed an application for disability insurance benefits ("DIB") on May 1, 2011, alleging that she became unable to work on April 28, 2010. The application was denied initially and on reconsideration by the Social Security Administration. On March 20, 2012, the plaintiff requested a hearing. The administrative law judge ("ALJ"), before whom the plaintiff, her attorney, and G. Roy Sumpter, an impartial vocational expert, appeared at a video hearing on July 9, 2013, considered the case de novo and, on November 15, 2013, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended. The ALJ's finding became the final decision of the Commissioner of Social

Security when the Appeals Council denied the plaintiff's request for review on February 5, 2015 (Tr. 1-5). The plaintiff then filed this action for judicial review.

In making the determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the ALJ:

> (1) The claimant meets the insured status requirements of the Social Security Act through December 31, 2015.
>
> (2) The claimant has not engaged in substantial gainful activity since April 28, 2010, the alleged onset date (20 C.F.R. § 404.1571 *et seq*).
>
> (3) The claimant has the following severe impairments: degenerative disc disease of the cervical spine with radicular pain in the upper extremities; fibromyalgia; thoracic and lumbosacral neuritis/radiculitis (20 C.F.R. § 404.1520(c)).
>
> (4) The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526).
>
> (5) After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 C.F.R § 404.1567(b) except I specifically find that the claimant can lift and carry up to 20 pounds occasionally and 10 pounds frequently. She can sit, stand, and walk for up to 6 hours, each, in an 8-hour workday. She can push and pull with her upper and lower extremities frequently. She can never use a ladder, rope, or scaffold but can occasionally climb ramps/stairs, balance, stoop, kneel, crouch, and crawl. She can reach overhead occasionally bilaterally. She must avoid concentrated exposure to hazards (i.e., dangerous machinery, unprotected heights).
>
> (6) The claimant is unable to perform any past relevant work (20 C.F.R. § 404.1565).
>
> (7) The claimant was born on May 30, 1962, and was 47 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. The claimant subsequently changed age category to closely approaching advanced age (20 C.F.R. § 404.1563).

2

(8)  The claimant has a limited education and is able to communicate in English (20 C.F.R. § 404.1564).

(9)  Transferability of job skills is not material to the determination of disability because the Medical-Vocational Rules support a finding that the claimant is "not disabled," whether or not claimant has transferable job skills (*See* SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

(10)  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that claimant can perform (20 C.F.R. § 404.1569 and 404.1569(a)).

(11)  The claimant has not been under a disability, as defined in the Social Security Act, from April 28, 2010, through the date of this decision (20 C.F.R. § 404.1520(g)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."  42 U.S.C. § 423(a).  "Disability" is defined in 42 U.S.C. § 423(d)(1)(A) as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions.  An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2)  has a severe impairment, (3)  has an impairment that equals an illness contained in the Social Security Administration's Official Listings of

3

Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment that prevents past relevant work, and (5) has an impairment that prevents him from doing substantial gainful employment. 20 C.F.R. § 404.1520. If an individual is found not disabled at any step, further inquiry is unnecessary. *Id.* § 404.1520(a)(4).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62, 1982 WL 31386, at *3. The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5). He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy that the plaintiff can perform despite the existence of impairments that prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as :

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a

4

> preponderance.  If there is evidence to justify a refusal to direct
> a verdict were the case before a jury, then there is "substantial
> evidence."

*Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citation omitted).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings and that the conclusion is rational.  *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964).  If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

### **EVIDENCE PRESENTED**

The plaintiff was 47 years old on her alleged disability onset date and 51 years old on the date of the ALJ's decision (Tr. 35).  She has a tenth grade education and previously worked loading newspapers, as a home health caregiver, and as a school bus driver (Tr. 138, 147).

On April 28, 2010, the plaintiff was treated in the emergency room for injuries associated with a motor vehicle collision, in which she experienced "mild" head and neck injuries resulting in reduced range of motion ("ROM"), muscle spasms, and pain on movement in her neck.  She was not in acute distress, was alert and oriented, and her sensation and motor function were within normal limits.  Her back was non-tender, her hips were stable, and she had no evidence of musculoskeletal trauma, or pedal edema.  Imaging of her neck showed normal alignment in her cervical spine, no compression or evidence of fracture, and although she exhibited disc space narrowing in several lower levels, her anterior soft tissues were normal.  She was diagnosed with moderate degenerative disc disease in her lower cervical spine with no acute bony abnormalities. On discharge, she was diagnosed with a neck sprain and prescribed ibuprofen 800, Flexeril, and Lortab to treat her pain and muscle spasms (Tr. 214-19).

On April 30, 2010, the plaintiff followed-up with Michael Alday, M.D., who noted that she had normal posture, gait, and strength, despite appearing in pain. The plaintiff's extremities had full ROM in all joints, and her neurological examination was normal.  Her cervical spine ROM was reduced due to spasm.  The plaintiff was also evaluated by David Trott, M.D., of Occupational Medicine, for neck pain and stiffness following a work-related motor vehicle accident.  The plaintiff reported worsened neck spasms but no radiculopathy.  She reported that Flexeril helped some but that Lortab was causing her to have nausea and vomiting.  Dr. Trott indicated that the plaintiff appeared to be in a lot of pain.  The plaintiff's cervical range of motion was reduced due to spasm, and her posterior cervical spine muscles were tight with noticeable spasms.  He switched her from Lortab to Ultram and kept her out of work until her follow-up in three days (Tr. 228-30)

On May 3, 2010, the plaintiff followed up with Dr. Trott, who noted that the plaintiff's neck ROM was limited and painful, but she had intact hand motor and sensory function.  The plaintiff reported that her pain was not as intense, but she felt swelling on her right side.  The plaintiff complained that Flexeril was making her sleepy but Ultram was relieving her pain.  Dr. Trott indicated that the plaintiff appeared to be in pain. The plaintiff's cervical range of motion was very limited, and she had tense, tender trapezius muscles bilaterally.  Dr. Trott indicated that he would restrict the plaintiff from commercial driving (Tr. 226-27).

On May 10, 2010, the plaintiff complained to Dr. Trott that her neck still hurt, and she was starting physical therapy the following day.  She reported intermittent numbness in both hands, right worse than left, but denied weakness.  On examination, she had limited ROM in all directions, but improved from her previous visit.  Her right trapezius was tender, but her hand motor and sensory function was intact with no cervical spinal tenderness.  The plaintiff also had tenderness in her right trapezius muscles, which were also very tense.  She had no muscle spasms or neurological deficits.  Her mood and affect

6

were normal, and she exhibited normal attention span and concentration. She was diagnosed with cervical strain and kept on Ultram (pain medication). Dr. Trott also recommended that the plaintiff continue with physical therapy and use of heat and biofreeze (Tr. 223-25).

The plaintiff participated in physical therapy from May 11, 2010, to May 20, 2010. She was discharged with instructions for a home exercise program and a TENS unit. Her discharge summary noted that her cervical ROM had improved throughout her therapy, and her pain was rated at five out of ten. She had "above average improvements," and her potential for continued improvement was "excellent." The notes indicate that the plaintiff continued to experience moderate pain (Tr. 232-42).

On May 17, 2010, Huneiza Shaikh, M.D., of Occupational Medicine, noted that the plaintiff reported increased pain after having run out of some of her medications. The plaintiff had tenderness on the left side of her neck and difficulty with range of motion. Dr. Shaikh diagnosed cervical strain. He continued the plaintiff on Ultram and recommended continued physical therapy, use of heat, and biofreeze (Tr. 267-69).

On May 24, 2010, treatment notes of Dr. Alday indicate that the plaintiff complained of continued neck strain, visible swelling toward her right shoulder, and pain with movement of her shoulder. She rated her pain as an eight out of ten. On examination, she showed no deformity, with normal posture, gait, and strength, despite the appearance of being in pain. Her extremities were normal with full ROM of all joints, and she had no neurological deficits. Dr. Alday indicated that the plaintiff appeared to be in a lot of pain, and he noted that she had finished physical therapy. He found the plaintiff to have tenderness diffusely to her right shoulder. Dr. Alday diagnosed cervical strain and prescribed Ultram. The plaintiff was referred to orthopedics for treatment (Tr. 220-22).

7

On June 10, 2010, Glenn Scott, M.D., of Orthopedic Surgery, evaluated the plaintiff for ongoing pain in her head, neck, and right shoulder areas. Her motor strength, sensation, and reflexes distally were normal. The plaintiff reported pain and stiffness with considerable tightness in the muscles of her neck and shoulder. Dr. Scott noted that the plaintiff tended to hold her neck in a guarded position. He found decreased ROM and tenderness in the cervical paravertebral muscles. Dr. Scott found sustained spasm in the plaintiff's right trapezius with tightness on the left. He noted the plaintiff described a somewhat generalized dysesthesia in her right upper extremity without following a clear-cut dermatomal pattern. Dr. Scott diagnosed cervicalgia. He stated, "I feel that the primary pathology is a cervical strain with persistent myofascial pain and spasm." He ordered an MRI and kept the plaintiff out of work in the interim. Dr. Scott also switched the plaintiff from Flexeril to Skelaxin during the day and refilled her Soma and Ultram. (Tr. 257-58).

On June 15, 2010, the plaintiff had a cervical MRI that showed multilevel degenerative disc disease changes most prominent from C3-C4 to C6-C7 where it is relatively symmetric causing mild central spinal stenosis and some foraminal narrowing (Tr. 255-56).

On June 16, 2010, Dr. Scott reviewed the plaintiff's recent cervical MRI, which indicated she had cervical disc protrusions at C3-4, C4-5, and C5-6, as well as some mild degenerative changes at C6-7 and C7-T1 (Tr. 253). The plaintiff reported continued pain and a numb sensation in her right hand. The plaintiff also reported numbness and tingling in the toes of her right foot and a clumsy feeling in her right leg. Dr. Scott indicated that the plaintiff was not capable of driving a school bus at that time (Tr. 253-54).

On June 29, 2010, the plaintiff underwent nerve conduction studies at Carolina Neurology Associates that were all within normal limits. The plaintiff had no neurological deficits, and her motor and sensory nerve studies were all normal, indicating

8

no cervical radiculopathy despite her claims that she experienced hand numbness and other symptoms (Tr. 248).

On June 30, 2010, Dr. Scott noted that the plaintiff's EMG and nerve conduction studies were normal. He found the plaintiff to have continued pain and stiffness in her neck and spasm at the base of her neck and trapezius area. Dr. Scott renewed the plaintiff's physical therapy and indicted that the plaintiff could not function as a school bus driver (Tr. 246-52).

The plaintiff participated in physical therapy from July 9, 2010, to August 3, 2010 (Tr. 273-98).

On July 21, 2010, Dr. Scott noted that the plaintiff reported interval improvement but no resolution of symptoms. Dr. Scott found the plaintiff to have continued tightness and tenderness in her right trapezius. He noted improved mobility and good motor strength. The plaintiff reported using her TENS unit primarily at night, and Dr. Scott recommended that she try to use it more during the day. He continued the plaintiff's current treatment regimen (Tr. 245).

On August 4, 2010, the plaintiff reported increased pain in her neck and arms. The plaintiff reported being unable to tolerate traction at therapy. The plaintiff had pain with motion of her neck and increased pain in her shoulder and upper arm with very gentle Spurling's maneuver. Dr. Scott discontinued physical therapy and indicated that the plaintiff needed a consultation with a neurosurgeon. He stated, "I do not feel she can function as a bus driver" (Tr. 243-44).

On October 7, 2010, the plaintiff received treatment from James P. Behr, M.D., of Orthopedic Associates. At the appointment, the plaintiff appeared alert, fully oriented, and in no acute distress. The plaintiff's gait was normal, and although her cervical ROM was painful and partially limited, straight leg raise testing was negative. Dr. Behr evaluated the plaintiff for cervical and back pain. Dr. Behr noted that on April 28, 2010, the

9

plaintiff was involved in a motor vehicle accident while driving a bus at work, and she reported having significant difficulty since that time. The plaintiff described her pain as a deep aching sensation beginning at the right occipital aspect of her head going down to her neck, to her thoracic spine to just below the scapula as well as radiating into her right shoulder and occasionally down over her right deltoid. The plaintiff also reported a rare pain radiating down her right lower extremity. The plaintiff indicated that her pain was constant, sharp, burning, achy with pins and needles sensations, and at four to eight out of ten. The plaintiff indicated that her pain was better with medications and worse with sitting, standing too long, or driving. Use of heat, a TENS unit, and bed rest were somewhat helpful, but massage therapy, physical therapy, and strengthening exercises had not made a difference. The plaintiff complained of right arm weakness, significant difficulty sleeping, and increased anxiety, depression, and irritability. Dr. Behr found the plaintiff's cervical ROM to be limited in all planes and extremely painful. He found give-way weakness on the right but indicated that this was likely secondary to pain. The plaintiff's neural tension signs were questionably positive on the right, but seemed to be more pain related. Dr. Behr noted that the plaintiff had been having significant right upper extremity pain and headaches since her accident. He indicated that the plaintiff's pain complaints were most likely related to whiplash type syndrome. He also noted that Dr. Kanos and Dr. Scott did not feel like she had a surgical lesion. Dr. Behr diagnosed lumbago and cervicalgia. He started the plaintiff on Flexeril and diclofenac and recommended continued home exercises, TENS unit use, and therapeutic massage. Dr. Behr limited the plaintiff to what he called light duty with no excessive pushing or twisting, no driving, and no lifting over 15 pounds (378-87).

On November 8, 2010, Lisa Spears, a nurse practitioner at Orthopedic Associates, evaluated the plaintiff. The plaintiff reported increased pain with treatment and only getting minimal relief with her TENS unit. Ms. Spears administered trigger point

injections, started the plaintiff on a trial of Lyrica, and continued the plaintiff's current treatment regimen (Tr. 374-77). On November 22, 2010, the plaintiff reported that massage therapy had worsened her pain for three to four days afterwards.  The plaintiff continued using her TENS unit three times a day with minimal relief. The plaintiff estimated that her pain was relieved by 60 to 75% with her medications.  The plaintiff reported that her neck pain was radiating down her sides, right greater than left. The plaintiff also reported increased heart flutter following her trigger point injections.  Ms. Spears increased the plaintiff's dose of Lyrica and restarted a trial of physical therapy.  Ms. Spears also administered trigger point injections and switched the plaintiff's Flexeril to Zanaflex (370-73).

The plaintiff participated in physical therapy between November 23, 2010, and January 4, 2011.  The plaintiff had not met any of her goals at the time of discharge and was still very limited by pain during movement (Tr. 312-37).

On January 6, 2011, Ms. Spears reevaluated the plaintiff.  The plaintiff reported that her pain was no better despite restarting physical therapy and indicated that the tasks she was asked to perform increased her pain.  Ms. Spears noted that the plaintiff's prior trigger point injections were not helpful.  The plaintiff indicated that she was still out of work because she could not turn her head from side to side.  The plaintiff reported that her pain medications were not helping as much as they had before.  The plaintiff's cervical ROM was limited and painful. Ms. Spears stated, "Again the patient is still complaining of both neck and upper shoulder pain which appears to be more myofascial related although she has not responded to physical therapy, massage therapy, ultrasound, or manual manipulation.  She continues to report difficulty with movement of her cervical region."  Ms. Spears indicated that she wanted to increase the plaintiff's dose of Lyrica, but the plaintiff reported that was not able to tolerate a higher dose. The plaintiff's Zanaflex dosing was adjusted because it caused sleepiness, and she was continued on diclofenac.

Ms. Spears also indicated that the plaintiff would remain out of work until her functional capacity evaluation (Tr. 364-67).

On January 12, 2011, Beverly Davis, R.P.T., performed a functional capacity evaluation of the plaintiff. Ms. Davis indicated that the plaintiff performed with determined effort and demonstrated appropriate pain behaviors. Ms. Davis stated that the plaintiff's "effort was seriously hindered by pain and muscle spasms, and she was not able to do some of the lifting, pushing, and pulling tests, and was not able to do the carrying test or the pinching tests at all." Ms. Davis indicated that the plaintiff needed "maximum assistance to get up from her knees when she attempted kneeling, and she cried out in pain many times during the testing session. She had severe muscle spasms that caused her to jerk, and she could not walk at that time." The plaintiff was noted to be "in tears by the time testing was suspended." Ms. Davis indicated that, based on the subjective job demands of a school bus driver, the plaintiff was "unable to perform all aspects of her regular duty job at this time." Ms. Davis indicated that the plaintiff's testing results showed that the plaintiff could perform sedentary work with no lifting below waist height with both hands, five pounds to shoulder height, and no lifting overhead with both hands. The plaintiff was able to lift three pounds below waist height with her right hand and 13 pounds with her left hand. The plaintiff was able to lift three pounds to shoulder height with her right hand and 12 pounds with her left hand. The plaintiff lifted zero pounds overhead with her right hand and eight pounds with her left hand. The plaintiff was unable to perform the carrying test at all. The plaintiff's push and pull strengths were measured dynamically with the BTE Primus and tested at 5# each. The plaintiff was able to sit, stand, and walk for occasional intervals and could dynamic and static bend and squat for occasional intervals. The plaintiff could not kneel or crawl. The plaintiff could climb less than five steps with a hand rail on her left. The plaintiff could perform occasional overhead reaching with her left hand only and occasional reaching at waist height with her left hand only. She could perform hand tasks with her left

hand primarily and occasionally used her dominant right hand to assist. The plaintiff's musculoskeletal exam showed very limited right upper extremity ROM. The plaintiff's spinal ROM was greatly limited, especially in lateral flexion and rotation to the right, and her neck ROM was extremely limited. Ms. Davis indicated that the plaintiff's usual neck position was forward-head with poor posture. The plaintiff was not able to tolerate manual muscle testing of her upper extremities due to increased neck and back pain. The plaintiff's balance was normal, and her gait was decreased to occasional tiny steps after she attempted stair climbing and kneeling (Tr. 303-11).

On January 19, 2011, Danny K. Crout, D.M.D., M.S., evaluated the plaintiff for ear, neck, shoulder, jaw, and head pain. The plaintiff reported daily pain and indicated that she gets dizzy and had limited and painful jaw opening. Dr. Crout indicated that the plaintiff's muscles in her head, neck, and shoulders were tender to palpation. The plaintiff had TMJ crepitus with opening and closing on both sides. Dr. Crout indicated that the plaintiff sat mildly slumped with rounded shoulders and a forward head posture. The plaintiff reported restless sleep and daytime fatigue. He indicated that the plaintiff's sleeping posture with snoring suggested she had a restricted airway and that the plaintiff had constant awakening. The plaintiff exhibited hyperalgesia and allodynia on palpation of her neck, shoulder, and jaw areas. Dr. Crout found hard trigger points and indicated that the plaintiff's scalenii muscles were pinching her brachial plexus causing arm pain and numbness. The plaintiff had trigger points in the splenius capitus muscles ("SCM"), and SCM affected the vestibular component in the plaintiff's ears, which caused dizziness. Dr. Crout indicated that the plaintiff was using dry heating pads frequently throughout the day, which caused swelling and pain in her neck and shoulder tissues. The plaintiff indicated that she was no longer taking Ultram because it caused glial cell inflammation. Dr. Crout recommended that the plaintiff stop taking Zanaflex and start cyclobenzaprine at bedtime. Dr. Crout indicated that the plaintiff had near constant, severe daily headaches, which were

13

muscle tension and medication induced.   He found stylomandibular strain, neural impingement by scalenii muscles, and auriculotemporal nerve inflammation.  He noted the plaintiff's motor vehicle accident and indicated that all injuries appeared to be  soft tissue. The plaintiff was missing several teeth and had incisal contact in centric relation/maximum intercuspation ("CR/MI").  He noted that she clenches and had limited opening, due to pain. Dr. Crout stated, "All signs and symptoms listed above are consistent with whiplash to include the jaw pain."   His assessment was "capsulitis of the TMJ, crepitus of the TMJ, dehydration, dizziness, earache from referred pain, ligament strain referring pain to head, neck and jaw, late effects of accident, mandibular discrepancy to cranial base, masseter parotid hypertrophy, observation following accident at work, occipital neuritis, postural kyphosis, sleep disorder, stress, temporal tendonitis, headache, trapezius muscle syndrome and whiplash."  He noted that the plaintiff had been to four separate physical therapists and one massage therapist and that she appeared to have central nervous system processing errors, including hyperalgesia, allodynia, chronic pain, etc.  Dr. Crout indicated that even if the plaintiff had some subclinical TMJ disorders, they were of no bother to her prior to the accident.  He explained that a "whiplash situation such as she experienced in this MVA can easily cause TMJ problems totally independent of any prior conditions.  Because the pain and limited function of her TMJ's occurred only after the accident, this is the case here." Dr. Crout indicated that the plaintiff's "neck, shoulders, head and jaw come as a unit when injuries occur in a whiplash such as during a MVA."  He recommended that she sleep with her head, neck, spine and hips in a straight line and that she drink 70 ounces of water daily. He recommended that she correct reading, phone, TV, sitting, and texting postures and instructed her not to use a dry heating pad.  He indicated that the plaintiff needed a bite guard to minimize fifth cranial nerve input (Tr. 299-300).

On January 27, 2011, Dr. Behr evaluated the plaintiff for neck and back pain. He noted that the plaintiff's gait was normal, and her straight leg raising was negative (Tr.

353-54).  He wrote that the plaintiff's complaints of pain were more than what he would expect based on the injury she sustained.  The plaintiff reported continued complaints of pain on the right side of her neck and difficulty with range of motion.  Dr. Behr indicated that the plaintiff had failed numerous treatment options including physical therapy, massage, and medications.  Dr. Behr adopted the functional capacity evaluation findings and indicated that it was appropriate to find that the plaintiff had reached maximum medical improvement.  However, he also indicated that it would be appropriate to continue with medication, including Zanaflex, diclofenac, and Lyrica, as well as an exercise program (Tr. 353-56).

On February 3, 2011, Dr. Behr signed a statement in which he found that the plaintiff would not need future medical care related to her motor vehicle collision injuries and noted that she had only a 3% medical impairment in her neck (Tr. 352).  Dr. Behr noted that the plaintiff's limits would not preclude her from working as a bus driver, but the amount of sitting may prove difficult for her given her complaints of pain (Tr. 356).  He went on to describe limitations, including that the plaintiff should not lift below waist height with both hands, five pounds shoulder height, and no lifting overhead with both hands.  Dr. Behr opined that the plaintiff was able to sit, stand, and walk for occasional intervals and dynamic and static bending and squatting for occasional intervals.  He wrote that she was unable to kneel or crawl and could climb less than five steps with a handrail on her left; she could perform occasional overhead reaching with the left hand only; and she could occasionally reach to her waist with the left hand only (Tr. 352).

On June 6, 2011, Dr. Crout indicated that he could see no reason that the plaintiff could not reach 100% recovery.  He stated, "While the MVA aggravated some pre-existing problems, therapy was poor and her self therapy (dry heat) was making matters worse."  He noted that the plaintiff did not respond properly to posture and texting issues.

He stated, "All she needs is proper care and a correct 'mind set' to overcome her problems. While I can perform these therapies in my office, I do not wish to treat this person" (Tr. 300).

On June 30, 2011, the plaintiff followed up with Dr. Behr, at which time her gait continued to be normal, and her straight leg raise testing was negative. The plaintiff reported that she was in "quite a bit of pain" and felt she might have had some swelling from Lyrica. On examination, the plaintiff's cervical ROM was painful and was limited in all planes, right greater than left. Dr. Behr noted give way weakness on the right but indicated this was likely secondary to pain. The plaintiff had neural tension signs that were questionably positive on the right, but seemed more pain related, and had facet loading questionably positive on the right. Dr. Behr noted the plaintiff's cervical MRI findings and indicated that it appeared that the plaintiff's pain complaints were "most likely related at this point, to whiplash type syndrome/myofascial pain." Dr. Behr indicated that the plaintiff was at maximum medical improvement. He switched her Lyrica to gabapentin and prescribed Ultram and Zanaflex (Tr. 349-51).

On September 13, 2011, Dale Van Slooten, M.D., a state agency medical consultant, reviewed the plaintiff medical records and authored a residual functional capacity ("RFC") assessment. Based on his review of the plaintiff's medical records, Dr. Van Slooten opined that the plaintiff was capable of occasionally lifting/carrying up to 20 pounds, frequently lifting/carrying up to ten pounds, standing, walking, or sitting for about six hours in an eight-hour workday (with normal breaks), and she had no limit in her ability to push or pull. Dr. Van Slooten considered the plaintiff's history arising from her motor vehicle collision; that her nerve conduction studies were normal; she experienced cervical tenderness and decreased ROM; she continued with pain despite therapy; and that she had no indication for surgery. Dr. Van Slooten further opined that the plaintiff should never climb ladders, ropes, or scaffolds, but she could occasionally climb ramps/stairs, balance, stoop, kneel, crouch, and crawl. She should be limited to occasionally bilateral overhead

16

reaching and had no visual or communicative limitations. She should avoid concentrated exposure to hazards, but she otherwise had no environmental limitations. Dr. Van Slooten found the plaintiff's statements only partially credible because her claims about pain and her limitations were out of proportion to the objective findings established by her treatment notes (Tr. 338-45).

On September 29, 2011, the plaintiff followed-up with Dr. Behr for back and neck pain. The plaintiff reported a "fair bit" of difficulty with neck pain radiating up and down her thoracic and cervical spines. She also reported that her medications were somewhat helpful. The plaintiff complained of fatigue, blurry eyes, nausea, numbness, and tingling in her arms and legs, and problems with heat and cold intolerance. Dr. Behr noted that the plaintiff had applied for disability. The plaintiff's physical exam findings were unchanged. He offered the plaintiff a cervical medial branch block injection, but the plaintiff was unable to have that done until March due to insurance issues. He indicated that he would try to send the plaintiff to a chiropractor and prescribed gabapentin, Ultram, and Zanaflex (Tr. 346-48).

On January 23, 2012, Seham El-Ibiary, M.D., a state agency medical consultant, reviewed the plaintiff medical records and authored an RFC assessment. Based on her review of the plaintiff's medical records, Dr. El-Ibiary opined that the plaintiff was capable of occasionally lifting/carrying up to 20 pounds, frequently lifting/carrying up to ten pounds, standing, walking, or sitting for about six hours in an eight-hour workday (with normal breaks), and she had no limit in her ability to push or pull. Dr. El-Ibiary considered, among other records, the plaintiff's history arising from her motor vehicle collision; her MRI showing multilevel degenerative disc disease; her complaints of pain in her shoulders; and her normal neurological testing. Dr. El-Ibiary further opined that the plaintiff could occasionally climb ladders, ropes, or scaffolds, and crawl, but she could frequently climb ramps/stairs, balance, stoop, kneel, and crouch. She should be limited to frequent bilateral

17

overhead reaching and had no visual, communicative, or environmental limitations.  Dr. El-Ibiary found the plaintiff's statements only partially credible (Tr. 391-98).

On March 29, 2012, Dr. Behr evaluated the plaintiff for continued pain, primarily in the right side of her neck.  The plaintiff reported that her pain was making her depressed.  The plaintiff continued to have limited and painful cervical ROM, mainly on the right versus the left and give way weakness on the right likely secondary to pain.  Neural tension signs and facet loading were questionably positive on the right.  Dr. Behr added Cymbalta for pain and depression and continued the plaintiff's other medications including Xanax, Ultram, gabapentin, and Zanaflex (Tr.  441-44).

On April 12, 2012, Gabriel O'Sullivan, D.C., evaluated the plaintiff for complaints of neck and back pain since her April 2010 accident.  Dr. O'Sullivan indicated that the plaintiff's muscles were taut and tender and/or spastic in her suboccipitals, cervical paraspinals, traps, thoracic paraspinals, and rhomboids.  He noted cervical spine swelling bilaterally and indicated that the plaintiff had difficulty performing muscle strength testing due to neck pain.  Dr. O'Sullivan scheduled chiropractic adjustments for the plaintiff's cervical, thoracic, and lumbar spines.  The plaintiff received treatment through May 10, 2012.  At that time, the plaintiff reported that her pain had not decreased since beginning chiropractic treatment and that she was getting pain in her lower back as well.  Dr. O'Sullivan stated, "It is my opinion that she will not be able to be helped by chiropractic.  I also feel that her condition is such that it could be exacerbated by any type of desk work/computer work or anything more strenuous due to the likely nature of the desk job/computer work creating an exacerbation of her cervical anterior flexion which would increase the strain on her discs."  He also stated, "I don't understand why her pain level is so high nor why she did not realize any relief from our care.  I am truly perplexed by her case" (Tr. 425-37, 445).

18

In May 2012, x-rays of the plaintiff's cervical spine indicated that she had osteophytes at multiple levels, but she had no fractures or subluxations. She had neural foraminal narrowing at C5-6 and C6-7 on the right. X-rays of her lumbar spine at that time showed that she had mild scoliosis, but her disc spaces and vertebral heights were maintained. Despite spondylotic changes present throughout the spine and degenerative changes of the facet joints, there were no fractures (Tr. 414-15).

On May 14, 2012, the plaintiff received treatment from Jeffrey Hutchings, M.D. She complained of chronic lower back and cervical neck pain related to a motor vehicle accident that occurred several years before. She reported that her pain had persisted despite seeing a chiropractor, participating in physical therapy, and taking medications including Neurontin, Skelaxin, and tramadol. On examination, Dr. Hutchings recorded that the plaintiff appeared to be in no distress, and her mood was normal. The plaintiff's paraspinous muscles were tender to palpation, she had some ROM limitations in her cervical spine, and she had a positive straight leg raising test at 45 degrees. The plaintiff had no spine fractures. Dr. Hutchings' diagnoses were cervicalgia, cervical radiculopathy, lumbar radiculopathy, lower back pain, and cervical spondylosis. He prescribed an increased dose of gabapentin and referred the plaintiff for a spine evaluation (Tr. 409-13).

On June 23, 2012, Dr. Behr reevaluated the plaintiff. He noted that chiropractic treatment was not helpful to the plaintiff and stated, "Unfortunately, very little we have done has been at all helpful for her." The plaintiff continued to report the same diffuse pain. On examination, the plaintiff had diffuse, exquisite tenderness to light touch and give way weakness. Dr. Behr increased the plaintiff's dose of Cymbalta and continued her on gabapentin. Dr. Behr indicated that he had little to offer and noted that the plaintiff may be better off getting a second opinion (Tr. 438-40).

On July 20, 2012, Dr. Hutchings recorded that the plaintiff's extremities were normal, but her cervical and lumbar spine was tender to palpation and had limited ROM.

19

The plaintiff reported that her back pain was severe and radiated down both her legs to her knees. She indicated that her pain was aggravated by bending, coughing, lying down position, sitting, standing, twisting, and stress. The plaintiff's stiffness was noted to be present all day. Dr. Hutchings indicated that the plaintiff had bladder incontinence, headaches, leg pain, numbness, paresis, paresthesias, pelvic pain, perianal numbness, tingling, and weakness. The plaintiff had not found relief despite a number of treatment strategies. The plaintiff reported that her neck pain was present on the right and left sides and occipital region. She rated her pain as ten out of ten. The plaintiff's neck pain was aggravated by swallowing, sneezing, stress, twisting, coughing, position, and bending. Dr. Hutchings indicated that the plaintiff had associated findings including headaches, leg pain, numbness, pain with swallowing, paresis, photophobia, tingling, trouble swallowing, and weakness. Dr. Hutchings diagnosed cervicalgia, lumbago, and brachial neuritis or radiculitis NOS. He refilled the plaintiff's medications and indicated that he would refer her to a pain clinic (Tr. 405-06).

Dr. Hutchings also completed a form on July 20, 2012, in which he opined that the plaintiff could not sit, stand, or walk at all during an eight-hour workday; she could occasionally lift/carry up to five pounds only; she could never use her hands to grasp, push, pull, or manipulate; she could not use either foot for repetitive movements such as pushing and pulling leg controls; she could not bend, squat, crawl, climb, or reach at all; and she could never be around unprotected heights or moving machinery, drive, or be exposed to dust, fumes, or gases. Dr. Hutchings further circled on the form that the plaintiff's pain was profound, intractable, and virtually incapacitating; she required substantial bed rest and medication; she had significant side effects that would affect her work; and her likelihood for successful treatment was unlikely. Dr. Hutchings indicated that the plaintiff's "pain and/or drug side effects can be expected to be severe and to limit effectiveness due to distraction, inattentiveness, drowsiness, etc." Dr. Hutchings stated, "Although the level of

pain may be less intense or less frequent in the future, it will still remain a significant element in this individual's life."  Dr. Hutchings also indicated that treatments such as biofeedback, nerve stimulators, and injections "have been used successfully in cases like this one" (Tr. 407-08).

On October 19, 2012, Dr. Hutchings saw the plaintiff again for scattered pain and fatigue.  Dr. Hutchings found the plaintiff to have tender points in her bilateral arms, back, chest, bilateral feet, bilateral hands, bilateral legs, and neck. Dr. Hutchings diagnosed fibromyalgia.  He referred the plaintiff for physical therapy and continued her current medications (Tr. 402-03).

On November 9, 2012, Dr. Hutchings noted that the plaintiff needed a referral to a pain clinic since physical therapy could not help her.  The plaintiff reported continued chronic pain and no benefit from Cymbalta.  Dr. Hutchings found generalized tenderness to palpation over multiple trigger points.  He diagnosed cervicalgia, brachial neuritis or radiculitis NOS, thoracic or lumbosacral neuritis or radiculitis unspecified, lumbago, cervical spondylosis without myelopathy, and fibromyalgia.  Dr. Hutchings referred the plaintiff to Physical Medicine Rehab, increased the plaintiff's dose of Cymbalta, refilled her Neurontin, and provided the plaintiff with a prescription for a permanent handicap sticker (Tr. 400-01, 404)

On December 4, 2012, Christopher Rubel, M.D., of Pain Management Associates, evaluated the plaintiff at Dr. Hutchings' request.  The plaintiff complained of cervical pain, lumbar pain, bilateral leg numbness, bilateral leg tingling, bilateral arm numbness, and bilateral arm tingling. Dr. Rubel noted that she had paresthesia in her bilateral upper and lower extremities and that the plaintiff had an established diagnosis of fibromyalgia.  The plaintiff reported that her pain had been exacerbated by a motor vehicle accident in 2010. Dr. Rubel elicited a detailed history and noted other complaints including fatigue, vision difficulties, headaches, generalized muscle weakness, depressive symptoms,

and sleep disturbance.  On examination, the plaintiff had generalized, moderate tenderness over her neck and shoulder girdle with limited ROM.  She also had generalized, moderate tenderness over her lumbar area with limited range of lumbar motion. The plaintiff had four out of five strength in the major muscle groups of her left upper extremity and three out of five strength in the major muscle groups of her right upper extremity.  She also had four out of five strength in lower extremities.  Dr. Rubel found decreased sensation in the plaintiff's upper and lower extremities and positive straight leg raise bilaterally.  Dr. Rubel diagnosed neck pain, cervical radiculitis, low back pain, neck pain, thoracic/lumbosacral neuritis and radiculitis, cervical radiculitis, myalgia and myositis, and paresthesia.  Dr. Rubel had the plaintiff sign a narcotic policy, and he advised her to use ice, heat, massage, and low-tech physical therapy to help with pain relief.  He obtained a urine drug screen and ordered diagnostic testing (Tr. 446-50).

On December 18, 2012, the plaintiff was evaluated by Dr. Rubel for follow up. He noted that the plaintiff's mood and affect were appropriate.  She reported no change in her symptoms and rated her pain at eight out of ten.  The plaintiff had generalized moderate tenderness over her neck and shoulder girdle, with flexion mildly restricted and extension moderately restricted.  The plaintiff demonstrated normal strength, tone, and stability in her neck and head.  The plaintiff had moderate generalized tenderness in her lumbar spine, with mild or moderate restriction on her ROM, but she had normal strength, tone, and stability.  The plaintiff had four out of five muscle strength in her left upper extremity and three out of five strength in her right upper extremity, with no muscle or joint tenderness in either arm.  The plaintiff had four out of five muscle strength and normal tone in each lower extremity.  Although she had decreased sensation in her arms and legs with positive straight leg raise testing, her gait was intact.  Dr. Rubel diagnosed neck pain, cervical radiculitis, low back pain, thoracic/lumbosacral neuritis and radiculitis, myalgia and myositis, and paresthesia.  He started the plaintiff on Percocet (Tr. 421-24).

22

On January 15, 2013, Dr. Rubel evaluated the plaintiff and reviewed her recent studies. The plaintiff complained of lower back and neck pain. She indicated that her pain medication did help. The plaintiff rated her pain at seven out of ten. The plaintiff's review of systems was positive for fatigue, vision difficulties, chest pains and palpitations, headaches, weakness, episodes of dizziness, depressive symptoms, and sleep disturbances. The plaintiff's physical examination was unchanged from her previous visit. Dr. Rubel increased the plaintiff's dose of Percocet (Tr. 417-20).

On April 9, 2013, Dr. Hutchings evaluated the plaintiff. The plaintiff reported that she "hurts all over" and was out of her chronic pain medications. The plaintiff complained that she felt "doped up" on Percocet and wanted a referral to a different pain doctor. Dr. Hutchings gave the plaintiff a Demerol injection, increased her dose of Cymbalta, and continued her other medications. He also provided the plaintiff with a referral to a different pain clinic (Tr. 453-54).

On April 30, 2013, the plaintiff, at her attorney's referral, underwent a mental status examination by psychiatrist Caleb Loring, M.D. Dr. Loring noted that the plaintiff was applying for disability benefits and that she claimed to experience depression since her 2010 motor vehicle collision. Dr. Loring noted that the plaintiff was pleasant and cooperative throughout the examination. The plaintiff reported to Dr. Loring that she has difficulty sleeping, has crying spells two to three times per week, is easily upset, and has other depression-related symptoms. On examination, the plaintiff arrived on time, completed her paperwork by herself, presented with good grooming and hygiene, made good eye contact, and was pleasant and cooperative. Her affect was dysphoric, she appeared to be fairly significantly depressed, and she cried during the interview at times. Her speech, thought process, and thought content were all normal. Dr. Loring wrote that the plaintiff made calculation errors when trying to accomplish the serial three's task, indicating attention and concentration problems. However, she knew the prior two

23

presidents and could recall two out of three unrelated words after brief delay.  Her insight and judgment were intact and good.  Dr. Loring opined that the plaintiff had low average intelligence.  With respect to her activities of daily living, the plaintiff reported to Dr. Loring that she essentially lies in bed all day or watches television.  The plaintiff admitted to sometimes wishing she was dead but had never actually attempted to harm herself.  Dr. Loring opined that the plaintiff "presented as an individual who is fairly significantly limited in the activities of daily living she is capable of accomplishing.  These limits appear to be primarily related to pain she is experiencing as well as depression that is related to her chronic pain."  He indicated that the plaintiff's pain was related to the injury she suffered in the 2010 accident and that the plaintiff had not been able to find any relief from her pain or depression despite seeking out treatment over the past few years.  He stated that the plaintiff "comes across as fairly pleasant and cooperative and does not seem to have any significant social problems."  He indicated that the plaintiff appeared to be easily confused while trying to perform a task that measures her ability to attend and concentrate and opined, "This confusion could interfere with her ability to learn simple vocational tasks and complete them at an adequate pace with persistence in a vocational setting."  Dr. Loring also stated, "Additionally the pain she is experiencing could exacerbate these concentration problems and be a significant distractor for her while trying to accomplish vocational tasks and conform to an expected full time work schedule."  Dr. Loring explained that medical records from multiple sources confirmed the significance of the plaintiff's pain and that her pain was evident during the assessment.  Dr. Loring indicated that the plaintiff would be capable of managing funds in her own best interest if she was awarded benefits.  Dr. Loring's diagnoses were mood disorder due to a chronic pain with major depressive-like episode; pain disorder associated with a general medical condition, chronic (post-accident

neck and back pain); severe stressors and chronic pain; and a Global Assessment of Functioning ("GAF") score of 35[1] (Tr. 455-57).

On May 30, 2013, Dr. Hutchings evaluated the plaintiff for chronic pain complaints. The plaintiff reported that her prior Demerol injection had helped considerably. Dr. Hutchings diagnosed fibromyalgia, lumbago, and thoracic or lumbosacral neuritis or radiculitis, unspecified.  Dr. Hutchings administered a Demerol injection and provided the plaintiff with samples of Cymbalta (Tr. 451-52).

On June 18, 2013, Dr. Loring completed a medical assessment of ability to do work-related activities form regarding the plaintiff.  Dr. Loring indicated that the plaintiff had a "limited but satisfactory" ability to follow work rules, to relate to co-workers, to deal with the public, to use judgment, and to interact with supervisors.  He indicated that the plaintiff had a "seriously limited and unsatisfactory" ability to function independently and to maintain attention and concentration.  Dr. Loring indicated that the plaintiff had "no useful ability to function" in her ability to deal with work stresses.  Dr. Loring explained that the plaintiff's pain and depression would "compromise her ability to manage stress effectively. They would also significantly decrease her ability to maintain attention and concentration as evidenced on the mental status exam."  Dr. Loring indicated that the plaintiff had a "limited but satisfactory" ability to understand, remember, and carry out simple job instructions and a "seriously limited and unsatisfactory" ability to understand, remember, and carry out complex or detailed but not complex job instructions.  Dr. Loring explained

---

[1]A GAF score is a number between 1 and 100 that measures "the clinician's judgment of the individual's overall level of functioning." *See* Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders*, 32-34 (Text Revision 4th ed. 2000) ("*DSM-IV*").  The court notes that the fifth edition of the DSM, published in 2013, has discontinued use of the GAF for several reasons, including "its conceptual lack of clarity (i.e., including symptoms, suicide risk, and disabilities in its descriptors) and questionable psychometrics in routine practice." *See* Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders*, 16 (5th ed. 2013) ("*DSM–V*").

25

that the plaintiff's "problems with pain and depression would interfere with her ability to make occupational adjustments."  Dr. Loring indicated that the plaintiff had a "limited but satisfactory" ability to maintain personal appearance.  He indicated that she had "no useful ability to function" in her ability to behave in an emotionally stable manner, to relate predictably in social situations, and to demonstrate reliability.  Dr. Loring explained that the plaintiff's depression and pain would "seriously compromise her abilities in this domain. She would not consistently be reliable.  This is based on her presentation and performance during this assessment as well as a review of her medical records" (Tr. 458-59).

The plaintiff's attorney also submitted a sworn statement dated July 2, 2013 by a vocational expert, Benson Hecker, Ph.D.  Dr. Hecker, responding to the plaintiff's attorney's questioning, stated that the plaintiff is unable to perform any substantial gainful work activity (Tr. 460-66).

Following the ALJ's decision, the plaintiff submitted evidence to the Appeals Council, which was made part of the record (Tr. 5).[2]  Specifically, the plaintiff submitted the deposition of Dr. Behr, which was taken on April 1, 2014.  Dr. Behr indicated that his specialties were physical medicine rehabilitation and pain management.  Dr. Behr indicated

---

[2]The Commissioner argues that the plaintiff "set forth evidence in her brief that was not presented to the ALJ"; the plaintiff does not argue that the evidence is new and material; and, therefore, the court should not consider such evidence (doc. 17 at 12 n.3).  The Commissioner's argument is rejected.  The Commissioner references the deposition of Dr. Behr (Tr. 467-75) and records from an April 1, 2014, MRI of the plaintiff's lumbar spine (Tr. 477-78) (doc. 17 at 12 n.3).  These records, as discussed herein, were submitted by the plaintiff to the Appeals Council, and the Appeals Council incorporated these documents into the record (Tr. 5).  When, as here, the Appeals Council receives additional evidence and denies review, the issue for the court is whether the ALJ's decision is supported by substantial evidence and reached through the application of the correct legal standard. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir.2011). "In making this determination, we 'review the record as a whole' including any new evidence that the Appeals Council 'specifically incorporated . . . into the administrative record.'" *Id.* (quoting *Wilkins v. Sec'y, Dept. of Health and Human Serv.*, 953 F.2d 93, 96 (4th Cir. 1991)).  Accordingly, the evidence presented to the Appeals Council and incorporated into the record is appropriate for consideration by this court.

that he first evaluated the plaintiff on October 7, 2010, for cervical spine pain and back pain. He indicated that the plaintiff's complaints remained consistent over the time he treated her with the last time being May 23, 2012. Dr. Behr noted that the plaintiff had also complained of headaches and right arm weakness. Dr. Behr testified that the plaintiff's MRI results "can be consistent with" and tended to correlate with the plaintiff's complaints of pain. Dr. Behr indicated that the plaintiff's clinical examination findings also tended to correlate with the plaintiff's complaints, explaining, "She did report there was a questionably positive nerve tension sign on the right, cervical range of motion was very painful limited in all planes and there was give way weakness on the right upper extremity." Dr. Behr also indicated that the plaintiff frequently complained of headaches and that headaches can be consistent with having the degree of definitive disease in her cervical spine that she had. Dr. Behr stated that it was correct that the neck pain and right arm weakness that the plaintiff complained of could be consistent with having the degree of cervical stenosis that the plaintiff had on her MRI imaging. Dr. Behr indicated that the plaintiff had reported rare pain radiating down her right lower extremity but explained that they focused mostly on the plaintiff's cervical pain, headaches, and upper back pain. Dr. Behr noted his indication of the plaintiff being limited to "light duty work" but stated that her functional capacity evaluation limited her to "sedentary work with no lifting which is essentially sedentary work." Dr. Behr stated that he would agree with the conclusion that the plaintiff's physical problems were consistent with that level of limitation. Dr. Behr explained that his conclusion was based on the plaintiff's MRI, along with her functional capacity evaluation. He stated that it was consistent with the plaintiff's condition that when she suffered from headaches that she would suffer frequent interruptions with concentration. He indicated that it was possible that the plaintiff's condition "would prevent her from being able to maintain a production pace even at simple tasks when she was having headaches." Dr. Behr testified that the plaintiff was limited to using her right arm no more than occasionally during the work day with occasionally being

27

defined as no more than one-third total of an eight-hour day.  He indicated that it was possible that the more she used her arms the more it would aggravate her neck pain.  Dr. Behr stated that he found no reason to doubt the plaintiff's complaint.  Dr. Behr indicated that the treatment modalities he tried did not appreciably help the plaintiff.  He explained that the plaintiff's whiplash symptoms would tend to improve over time, but the degenerative changes in her spine would tend to either stay the same or worsen over time. Dr. Behr indicated that it was likely that the limitations he endorsed in this statement were present throughout the time period he treated the plaintiff (Tr. 467-75).

The plaintiff also submitted records from an April 1, 2014, MRI of her lumbar spine that showed mild lumbar levoscoliosis and facet arthrosis from L3-4 to L5-S1 (Tr. 477-78).

The plaintiff stated in a disability report that she experienced pain in her back and neck, which radiates into her shoulders and her arms.  She also claimed to experience pain in her head, and headaches, as well as swelling in her legs, neck, and hands, and numbness in her fingertips occasionally.  She further claimed to experience frequent fatigue, intermittent dizziness, and some hearing loss.  She alleged that she has difficulty standing, walking, and sitting for long periods due to her neck and back pain.  The plaintiff reported that she avoids lifting objects heavier than five pounds, has difficulty gripping, performing postural movements, and pushing.  She further reported that she experiences mood swings and crying spells, avoids socializing, and has difficulty focusing and concentrating (Tr. 162-63). The plaintiff also reported that she has difficulty showering for long periods or reaching to wash herself or get dressed.  She claimed she has difficulty lifting cooking implements, but she is able to perform light chores such as washing dishes or straightening her home.  She claimed that she no longer drives due to her pain, and she claimed to have difficulty sleeping (Tr. 168).

28

The plaintiff testified at the hearing that she stopped working when she was in a collision while driving her school bus. She testified that, as a result, she experiences pain in her neck and back, which radiates to her arms and hands, causing muscle weakness. She also claimed to experience burning pain in her hips due to fibromyalgia. The plaintiff testified that she can only walk less than 100 feet at a time. The plaintiff also exhibited a swollen neck and claimed to experience headaches. The plaintiff went on to reiterate the complaints she reported earlier in her written statements. The plaintiff further testified that she gets depressed when considering her physical impairments (Tr. 58-62).

The plaintiff testified that she had not undergone surgery for her back or neck. She had not been treated by a mental health professional to address her claims of depression symptoms. She had never been hospitalized due to mental health issues for more than 24 hours. She testified that she takes Cymbalta to address her mental condition (Tr. 66-67).

The plaintiff testified that she performed some limited cooking, cleaned dishes, and dusted. She attended religious services two to three times monthly and visited stores (Tr. 68-70).

At the July 2013 administrative hearing, the ALJ posed a hypothetical question to the vocational expert, asking whether someone with the plaintiff's age, education, past relevant work, and RFC, as set forth above, could perform the plaintiff's past relevant work as a school bus driver. The vocational expert testified that such a hypothetical person could not perform the plaintiff's prior work. However, the vocational expert testified that such a person could perform other jobs in the national economy, including as a cashier, a storage facility rental clerk, and a bench assembler (Tr. 72-73)

The plaintiff's attorney asked about missing one day every other week from work, and the vocational expert explained, "[G]enerally speaking, at this skill level if you miss more than one or two days a month, that usually will lead to termination, so . . . my

answer would be, yes, sir, it would exclude any competitive employment." The vocational expert further testified that the three identified jobs would be precluded if "you rule out fine dexterity." The vocational expert also testified that competitive employment would be precluded for a person who was distracted due to pain and depression for ten percent or more of the time during the working day. Further, the vocational expert testified that a limitation to frequent bilateral handling would preclude the bench assembler job as would the limitation to only occasional use of her dominant hand (Tr. 74-78).

## ANALYSIS

The plaintiff argues that the ALJ erred by (1) improperly ignoring opinion evidence and giving significant weight to non-examining physician's opinions without adequate reasoning and (2) failing to include limitations related to her mental impairment in the RFC analysis.

### *Medical Opinions*

The plaintiff first argues that the ALJ improperly discounted the opinions of several medical sources (doc. 14 at 29-36). The regulations require that all medical opinions in a case be considered, 20 C.F.R. § 404.1527(b), and, unless a treating source's opinion is given controlling weight, weighed according to the following non-exclusive list: (1) the examining relationship; (2) the length of the treatment relationship and the frequency of the examinations; (3) the nature and extent of the treatment relationship; (4) the evidence with which the physician supports his opinion; (5) the consistency of the opinion; and (6) whether the physician is a specialist in the area in which he is rendering an opinion. *Id.* § 404.1527(c)(1)-(5). *See also Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005). However, statements that a patient is "disabled" or "unable to work" or similar assertions are not medical opinions. These are administrative findings reserved for the Commissioner's determination. SSR 96-5p, 1996 WL 374183, at *5.

The opinion of a treating physician is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not

30

inconsistent with the other substantial evidence in the case. *See* 20 C.F.R. § 404.1527(c)(2); *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001). Social Security Ruling ("SSR") 96-2p requires that an ALJ give specific reasons for the weight given to a treating physician's medical opinion. 1996 WL 374188, at *5. As stated in SSR 96-2p:

> [A] finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. §§ 404.1527 and 416.927. In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

*Id.* at *4.

The undersigned agrees with the Commissioner that the ALJ appropriately considered the opinions cited by the plaintiff and gave specific reasons for the weight given to each opinion as will be discussed below.

### Dr. Loring

As more fully set forth above, on April 30, 2013, Dr. Loring performed a mental status examination of the plaintiff on her attorney's referral. Dr. Loring opined that the plaintiff "presented as an individual who is fairly significantly limited in the activities of daily living she is capable of accomplishing. These limits appear to be primarily related to pain she is experiencing as well as depression that is related to her chronic pain." He stated that the plaintiff "comes across as fairly pleasant and cooperative and does not seem to have any significant social problems." He indicated that the plaintiff appeared to be easily confused while trying to perform a task that measures her ability to attend and concentrate and opined, "This confusion could interfere with her ability to learn simple vocational tasks and complete them at an adequate pace with persistence in a vocational setting." Dr. Loring also stated, "Additionally the pain she is experiencing could exacerbate these

concentration problems and be a significant distractor for her while trying to accomplish vocational tasks and conform to an expected full time work schedule." Dr. Loring's diagnoses were mood disorder due to a chronic pain with major depressive-like episode; pain disorder associated with a general medical condition, chronic (post-accident neck and back pain); severe stressors and chronic pain; and a GAF of 35 (Tr. 455-57).

The ALJ considered Dr. Loring's opinion at step two of the sequential evaluation process (Tr. 24-25) as well as in the RFC analysis (Tr. 32-33), finding it was entitled to "little weight." Specifically, The ALJ found that the plaintiff's alleged depression related symptoms were not severe at step two because they did not cause more than minimal limitations in the plaintiff's ability to perform basic mental work activities. The ALJ noted that the plaintiff had not undergone any mental health treatment since her alleged onset date. The plaintiff argues that this was error because she "was not required to have any specialized treatment before Dr. Loring's opinions could be believed" (doc. 14 at 37). However, "an unexplained inconsistency between the claimant's characterization of the severity of her condition and the treatment she sought to alleviate that condition" is a valid consideration for the ALJ. *Mickles v. Shalala*, 29 F.3d 918, 930 (4th Cir. 1994). Furthermore, the consistency of the opinion with the record as a whole is a factor in the evaluation of medical opinions. 20 C.F.R. § 404.1527(c)(4) (listing the factors in evaluating opinions from medical sources, including whether the opinion is supported by clinical evidence or consistent with other substantial evidence). The ALJ here appropriately noted that, despite her allegations, the treatment record as a whole consistently showed her mood, affect, attention, and concentration to be normal (Tr. 24; *see* Tr. 224, 410, 418, 448).

In making the step two finding, the ALJ pointed out that the only evidence as to her mental condition not being normal was the one-time examination arranged by her attorney with Dr. Loring (Tr. 24; *see* Tr. 455-59). The ALJ found that Dr. Loring's one-time

evaluation and opinion were inconsistent with the mental longitudinal history and the plaintiff's self-reports of not having any problems with respect to mental illness that she made in her initial filings to the agency (Tr. 24). The ALJ summarized the plaintiff's treatment history, which indicated that she was alert and cooperative, expressed understanding of risks, benefits, and alternatives of medication and treatment, was fully oriented, had normal mood and affect, denied difficulty, anxiety, depression and suicidal thoughts, and had normal attention span and concentration (Tr. 24; *see* Tr. 224, 268, 347, 350, 354, 365, 371, 375, 410, 418, 424, 448, 439). The ALJ found that this evidence was inconsistent with Dr. Loring's opinion and GAF score (Tr. 24). Furthermore, in the RFC analysis, the ALJ noted that Dr. Loring never treated the plaintiff and only saw her once on the request of her attorney (Tr. 32). The length of the treatment relationship and the frequency of the examinations and the nature and extent of the treatment relationship are appropriate factors for consideration in evaluating a medical opinion. 20 C.F.R. § 404.1527(c)(2). Further, the ALJ again noted that Dr. Loring's opinion was inconsistent with the mental status checks in the record (Tr. 32). Moreover, the ALJ noted an internal inconsistency in the opinion: Dr. Loring stated that the plaintiff did not have significant social problems, but then opined that she had poor or no ability to make social adjustments in a work environment (Tr. 32; *see* Tr. 457, 459). Lastly, the ALJ noted that Dr. Loring's opinion appeared to be based mainly on the plaintiff's subjective complaints rather the cognitive testing he performed, which showed only mild limitations in the Paragraph B criteria (Tr. 24-26, 32).

Based upon the foregoing, substantial evidence supports the ALJ's assignment of little weight to Dr. Loring's opinion.

### *Dr. Hutchings*

As more fully set forth above, Dr. Hutchings completed a form on July 20, 2012, in which he opined that the plaintiff could not sit, stand, or walk at all during an

33

eight-hour work day; she could occasionally lift/carry up to five pounds only; she could never use her hands to grasp, push, pull, or manipulate; she could not use either foot for repetitive movements such as pushing and pulling leg controls; she could not bend, squat, crawl, climb, or reach at all; and she could never be around unprotected heights or moving machinery, drive, or be exposed to dust, fumes, or gases.  Dr. Hutchings further circled on the form that the plaintiff's pain was profound, intractable, and virtually incapacitating; she required substantial bed rest and medication; she had significant side effects that would affect her work; and her likelihood for successful treatment was unlikely (Tr. 407-08).

The ALJ assigned little weight to Dr. Hutchings' opinion (Tr. 31). In doing so, the ALJ noted that Dr. Hutchings had only seen the plaintiff twice before issuing his disability opinion.  The ALJ further noted that Dr. Hutchings' physical examinations of the plaintiff did not support the extreme limitations set forth in his opinions.  Specifically, the ALJ pointed out that the plaintiff's physical examinations only showed some tenderness to palpation and limited ROM (Tr. 31; *see* Tr. 406, 410). The ALJ acknowledged that the plaintiff experienced back and neck problems, but found that Dr. Hutchings' extreme limitations were not supported by the longitudinal history of treatment. The ALJ identified several portions of the opinion, which he deemed "border[ing] on ludicrous," such as that the plaintiff could not sit at all despite that she sat during the entire administrative hearing before the ALJ for over 45 minutes (31). The ALJ further noted that, although Dr. Hutchings opined that the plaintiff could walk and stand for zero hours each, the ALJ observed the plaintiff walking to the hearing, and other physicians repeatedly noted that the plaintiff was ambulatory with a normal gait (Tr. 31; *see* Tr. 221, 228, 273, 339, 349-50, 353-54, 379-80, 392, 423, 439, 442, 456).

Dr. Hutchings also opined that the plaintiff was incapable of simple grasping, pushing and pulling, fine manipulation, bending, squatting, crawling, climbing, reaching, and could never be exposed to unprotected heights, moving machinery, driving, or exposure to

34

dust, fumes, and gases (Tr. 408). However, the ALJ noted that nothing in the record supported a preclusion to exposure to dust fumes and gases, such as what one might expect from a claimant with asthma or another lung condition (Tr. 31; *see* Tr. 407). The ALJ pointed out that various physical exams revealed no deformity and normal ROM in the plaintiff's extremities, no vertebral tenderness (lumbar), normal sensation and motor function, that the plaintiff was ambulatory with normal posture and gait, normal strength, no neurologic deficits, and her hand motor and sensory function were intact (Tr. 31; *see* Tr. 221, 223-24, 226, 228, 248, 273, 339, 349-50, 353-54, 379-80, 392, 406 423, 439, 442, 456). The ALJ also noted that the plaintiff reported doing some light household chores and activities of daily living, albeit with pain, which illustrated her ability to perform some postural and manipulative tasks, in contradiction to Dr. Hutchings findings (Tr. 31; *see* Tr. 275). Moreover, the ALJ explained that Dr. Hutchings appeared to not have performed a thorough musculoskeletal examination and instead relied on the plaintiff's subjective complaints and reports (Tr. 31;*see* Tr. 405-06). The ALJ pointed out that Dr. Hutchings even found that the plaintiff's extremities were normal on examination despite offering an opinion to the contrary (Tr. 32; *see* Tr. 402, 406, 410). Furthermore, Dr. Hutchings opined that the plaintiff would experience "significant side effects" from her medication and would limit her abilities due to distraction, inattentiveness, and drowsiness (Tr. 408); however, no such side effects were indicated in Dr. Hutchings' notes nor in the medical record as a whole (Tr. 32).

Based upon the foregoing, the ALJ's decision to give little weight to the extreme limitations opined by Dr. Hutchings' is based upon substantial weight and is without legal error.

### Dr. O'Sullivan

On May 10, 2012, Dr. O'Sullivan, a chiropractor, who treated the plaintiff for approximately one month, stated, "It is my opinion that she will not be able to be helped by chiropractic. I also feel that her condition is such that it could be exacerbated by any type

35

of desk work/computer work or anything more strenuous due to the likely nature of the desk job/computer work creating an exacerbation of her cervical anterior flexion which would increase the strain on her discs." He also stated, "I don't understand why her pain level is so high nor why she did not realize any relief from our care. I am truly perplexed by her case" (Tr. 425).

The ALJ noted that, as a chiropractor, Dr. O'Sullivan was not an acceptable medical source, and thus, his opinion was not entitled to controlling weight (Tr. 32). The regulations define "acceptable medical sources" as licensed physicians, psychologists, optometrists, and podiatrists, and qualified speech-language pathologists. 20 C.F.R. § 404.1513(a). "[O]nly 'acceptable medical sources' can be considered treating sources, . . . whose medical opinions may be entitled to controlling weight," and "only 'acceptable medical sources' can give . . . medical opinions." SSR 06-03p, 2006 WL 2329939, at *2. "Other sources" who are not "acceptable medical sources" include nurse practitioners, physician assistants, licensed clinical social workers, naturopaths, chiropractors, audiologists, and therapists. SSR 06-03p, 2006 WL 2329939, at *2. Evidence from other sources may be used "to show the severity of [a claimant's] impairment(s) and how it affects [his or her] ability to work." 20 C.F.R. § 404.1513(d). The ALJ "generally should explain the weight given to opinions from . . . 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." SSR 06-03p, 2006 WL 2329939, at *6. The weight to be given to evidence from other sources "will vary according to the particular facts of the case, the source of the opinion, including that source's qualifications, the issue(s) that the opinion is about, and many other factors . . . ." Id. at *4. Social Security Ruling 06-03p provides that factors for consideration in evaluating such an opinion include the same factors described above for evaluation of medical opinions from acceptable medical sources, which include

36

the length and frequency of the treatment relationship, the consistency of the opinion with other evidence, the degree to which the source presents relevant evidence to support the opinion, how well the opinion is explained, whether the source is a specialist, and any other factors tending to support or refute the opinion.  *Id.* at *4-5.

Here, the ALJ explained that he gave little weight to Dr. O'Sullivan's opinion that the plaintiff could not perform certain types of work because it was not supported by the physical examination findings, which did not indicate the plaintiff would need sedentary-type restrictions(Tr. 32).  Further, the ALJ assigned little weight to Dr. O'Sullivan's opinion because his finding that the plaintiff could not perform certain desk work or computer work was within the realm of a vocational expert and not a chiropractor (Tr. 32).

Based upon the foregoing, substantial evidence supports the ALJ's assignment of little weight to Dr. O'Sullivan's opinion.

### *Dr. Hecker*

The ALJ also considered the sworn statement, dated July 2, 2013, of vocational expert Dr. Hecker.  Dr. Hecker, responding to the plaintiff's attorney's questioning, stated that the plaintiff was unable to perform any substantial gainful work activity (Tr. 460-66). The ALJ gave the opinion little weight (Tr. 33). The ALJ noted that Dr. Hecker is a vocational expert and not a medical doctor, and thus, he was not qualified to review medical records as he purportedly did (Tr. 33; *see* Tr. 462-66). The ALJ further noted that Dr. Hecker relied on the unsubstantiated opinions of Drs. Loring and Hutchings, which the ALJ found were unreliable, as discussed above (Tr. 33; *see* Tr. 460-66). The ALJ further noted that it is the responsibility of the ALJ, not a vocational expert, to establish the RFC (Tr. 33). *See* 20 C.F.R. §§ 404.1545(a), 404.1527(d)(2) (final responsibility for determining a claimant's RFC is reserved to the Commissioner, who will not give any special significance to the source of another opinion on this issue).

37

Based upon the foregoing, substantial evidence supports the ALJ's assignment of little weight to Dr. Hecker's opinion.

### Ms. Davis and Dr. Behr

As more fully set forth above, on January 12, 2011, physical therapist Ms. Davis performed a functional capacity evaluation of the plaintiff. Ms. Davis opined that the plaintiff could perform sedentary work with no lifting below waist height with both hands; only lifting five pounds to shoulder height; no lifting overhead with both hands; only pushing and pulling five pounds; sitting/standing/walking for occasional intervals; bending/squatting for occasional intervals; no crawling or kneeling; can climb less than five steps with a handrail; occasional overhead and waist height reaching with the left upper extremity; and perform hand tasks primarily with the left and occasionally with the use of the dominant right hand (Tr. 303-11).

The ALJ gave Ms. Davis' opinion little weight (Tr. 30). In doing so, the ALJ agreed that the plaintiff had work-related limitations, but noted that the physical examinations, discussed above, did not warrant the significant limitations proposed by Mrs. Davis. The ALJ pointed out that treatment notes from Ms. Davis' North Grove Physical Therapy do not include comprehensive examinations showing significant limitations (Tr. 30). Furthermore, the ALJ noted that, as a physical therapist, Ms. Davis is not an acceptable medical source to accord controlling weight. *See* SSR 06-03p, 2006 WL 2329939, at *1-2; 20 C.F.R. §§ 404.1513(a), (d)(1), 404.1527(a)(2), (c)(2). The ALJ further noted that x-rays of the cervical spine (May 2012) revealed osteophytes with foraminal narrowing, some mild scoliosis with disc spaces and vertebral height maintained (Tr. 413–14); MRI of the cervical spine (June 2010) disclosed normal alignment, mild stenosis but no significant foraminal stenosis (Tr. 255-56); EMG and nerve conduction studies (June 2010) were entirely normal with no evidence of cervical radiculopathy (Tr. 248-52); and, while not extensive, the plaintiff's activities of daily living included the ability to cook, do dishes, attend church, shop,

38

and go out to get something to eat (Tr. 29-30). The ALJ found that the tests and the plaintiff's activities of daily living were inconsistent with the extreme limitations opined by Ms. Davis (Tr. 30).

On February 3, 2011, Dr. Behr signed a statement in which he found that the plaintiff would not need future medical care related to her motor vehicle collision injuries and noted that she had only a 3% medical impairment in her neck (Tr. 352). Dr. Behr noted that the plaintiff's limits would not preclude her from working as a bus driver, but the amount of sitting may prove difficult for her given her complaints of pain (Tr. 356). His RFC assessment was the same as that provided by Ms. Davis (Tr. 352, 355).

The ALJ likewise gave certain portions of Dr. Behr's opinion little weight (Tr. 30-31). The ALJ noted that Dr. Behr had not treated the plaintiff consistently since her alleged onset date, and some treatment records showed that he did not actually examine the plaintiff personally (Tr. 30 (citing Tr. 438-44)). The ALJ found that Dr. Behr's opinion with respect to lifting five pounds; no overhead lifting with both hands; and only occasional sitting, standing, and walking was unsupported by the evidence in the record (Tr. 31). In support of this finding, the ALJ cited physical examination findings showing that the plaintiff had normal gait; reflexes were equal and symmetrical; MRI of the cervical spine interpreted by Dr. Behr showed only mild stenosis; nerve conduction studies were normal; and straight leg raise was repeatedly negative (Tr. 31 (citing Tr. 248-52; 346-90, 438-44)). The ALJ gave great weight to Dr. Behr's opinion with respect to overhead reaching limitations, bending, squatting, kneeling, crawling, pushing and twisting, and light duty work (Tr. 30-31; *see* Tr. 352).

The plaintiff argues that the ALJ's analysis is in error because "the objective data . . . well-supported an opinion of disability" (doc. 18 at 6). Specifically, the plaintiff notes that a cervical spine x-ray in May 2012 showed osteophytes at multiple levels and neural forminal narrowing, which were not found to be mild (doc. 14 at 31 (citing Tr. 412)).

However, the June 2010 MRI cited by the ALJ was the one relied upon by Dr. Behr in his findings (Tr. 354-56). Furthermore, the court does not reweigh conflicting evidence or substitute its judgment for that of the Commissioner. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir.1990).

Based upon the foregoing, the ALJ's findings as to Ms. Davis' and Dr. Behr's opinions are supported by substantial evidence.

### *Mental Impairment*

The plaintiff next argues that the ALJ's RFC finding is not supported by substantial evidence because the ALJ did not include any limitations related to her mental impairments (doc. 14 at 37-38). The plaintiff specifically argues that the ALJ erred in failing to adopt the limitations related to her mental impairments as set forth by Dr. Loring (doc. 14 at 37-38). However, as discussed above, the ALJ found that Dr. Loring's opinion was entitled to little weight, and substantial evidence supports that finding. Moreover, substantial evidence supports the ALJ's finding that the plaintiff's depression was not a severe impairment (Tr. 24). Specifically, the ALJ found that the plaintiff's alleged depression related symptoms were not severe at step two because they did not cause more than minimal limitations in the plaintiff's ability to perform basic mental work activities. The ALJ noted that the plaintiff had not undergone any mental health treatment since her alleged onset date, and her mental status checks showed normal mood, affect, attention span, and concentration (Tr. 24; *see* Tr. 224, 410, 418, 448). Further, the ALJ noted (Tr. 24) that the plaintiff did not claim a mental condition in her initial application (Tr. 136-46), and, on reconsideration, the plaintiff reported that she did not see anyone for emotional or mental problems that limit ability to work (Tr. 162-70). The ALJ properly assessed the plaintiff's functional limitations resulting from her mental impairments by addressing four areas of functioning (activities of daily living, social functioning, concentration, persistence, or pace, and episodes of decompensation). *See* 20 C.F.R. 404.1520a. The ALJ found that

the plaintiff only had mild limitations in the first three areas and no episodes of decompensation (Tr. 25-26). If a claimant's limitations in the first three areas are rated as "none" or "mild" and the claimant's limitations in the fourth area are rated as "none," then the claimant's mental impairment will generally be found to not be severe. *See id.* § 404.1520a(d)(1).

While the plaintiff was prescribed Cymbalta for pain and depression (Tr. 443), this fact alone does not establish that the plaintiff had a severe mental impairment. Furthermore, the ALJ considered the plaintiff's alleged mental impairment in the RFC analysis (Tr. 32-33). Importantly, the plaintiff has not pointed to functional limitations caused by her alleged mental impairment in excess of the limitations found by the ALJ in the RFC finding. Here, the ALJ found the plaintiff could perform a limited range of light work and specifically explained the reasons for this finding (Tr. 26-35). The ALJ's RFC finding was supported by the opinion of state agency physician Dr. Van Slooten. The ALJ gave great weight to that opinion and explained the reasons why he gave greater weight to Dr. Van Slooten's opinion of a more restrictive RFC than to the opinion of state agency physician Dr. El-Ibiary (Tr. 33-34; *see* Tr. 391-98, 538-45). The ALJ was required to consider the state agency physician assessments as opinion evidence. *See* 20 C.F.R. § 404.1527(e)(2)(i) ("State agency medical and psychological consultants . . . are highly qualified physicians, psychologists, and other medical specialists who are also experts in Social Security disability evaluation. Therefore, administrative law judges must consider findings and other opinions of State agency medical and psychological consultants . . . as opinion evidence, except for the ultimate determination about whether you are disabled."). *See* SSR 96-6p, 1996 WL 374180, at *3 ("In appropriate circumstances, opinions from State agency medical . . . consultants . . . may be entitled to greater weight than the opinions of treating or examining sources."); *Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir.1984) ("[T]he testimony of a non-examining, non-treating physician should be

41

discounted and is not substantial evidence when totally contradicted by other evidence in the record. . . . [W]e have also ruled that the testimony of a non-examining physician can be relied upon when it is consistent with the record.") (citations omitted).

Based upon the foregoing, the undersigned finds no error in the ALJ's consideration of the plaintiff's alleged mental impairment.

## CONCLUSION AND RECOMMENDATION

This court finds that the Commissioner's decision is based upon substantial evidence and free of legal error.  Now, therefore, based upon the foregoing,

IT IS RECOMMENDED that the Commissioner's decision be affirmed.

IT IS SO RECOMMENDED.

s/ Kevin F. McDonald
United States Magistrate Judge

May 31, 2016
Greenville, South Carolina

42